**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**ANDREA DUNN,** on behalf of herself and
all others similarly situated,

          Plaintiff;

  **v.**

**COUNTY OF WILL** and **MIKE KELLEY,**
Sheriff of Will County, individually and in
his official capacity.

          Defendants.

Case No. 18 CV 6304

Hon. Charles P. Kocoras

Magistrate Hon. Young B.  Kim

**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT,
AWARD OF ATTORNEY'S FEES AND EXPENSES,
AND INCENTIVE AWARD TO NAMED PLAINTIFF**

## Table of Contents

BACKGROUND................................................................................................................2

ARGUMENT ...................................................................................................................4

    I.      **The Court should approve the settlement because it is fair, reasonable, and adequate**................................................................................................................9

      A. Andrea Dunn, Heffner Hurst, and the Law Office of Jordan Marsh have vigorously and successfully represented the classes through investigation, litigation, and settlement negotiations. .........................................................................................................10

      B. The settlement was negotiated at arm's length, with the assistance of a proactive, hands-on mediator in Magistrate Judge Kim. ........................................................................12

      C. The settlement's relief is excellent—it creates a $2 million fund to compensate class members for he violation of their constitutional rights, guarantees the Will County Sheriff and courts seriously monitor the time spent in, and conditions of confinement of, the jail's short-term booking cells, and has already led to the provision of soap and other sanitary measures to combat the potential spread of infectious disease in the jail. ..............................................................................................................13

          1.  The costs, risks, and delay of continued litigation favor approval of this settlement. ............................................................................................15

          2.  The effectiveness of the proposed distribution method favors approval of this settlement. ............................................................................................16

          3.  The terms and timing of the proposed attorney's fee award favor approval of this settlement. ..................................................................................16

      D. The settlement treats class members equitably with respect to each other. ..................17

      E. The settlement satisfies all the traditional Seventh Circuit factors used in evaluating the fairness, reasonableness, and adequacy of a class-action settlement. .............................20

    II.     **The Court should award Class Counsel 33% of the settlement recovery as attorney's fees under FRCP 23 (h) in light of the substantial monetary recovery and significant non-monetary relief achieved.** ........................................................22

          A.  A fee of 33% is below market for contingency representation in § 1983 class-action litigation. ..............................................................................................23

B.  The value of the settlement to the class, the risk of nonpayment, the quality of the attorneys' performance, the amount of work necessary to resolve the litigation, and the stakes of the case all auger in favor of a higher than market rate, not a lower one. ................................................................................................................... 24

C.  Class Counsel should be reimbursed for costs in the amount of $4,103.48. ...........26

**III.  Class representative, Andrea Dunn, should be awarded an incentive award for her efforts in bringing this action on behalf of the classes.** .............................................27

**CONCLUSION** .........................................................................................................................29

## Table of Authorities

**Cases**

*Armstrong v. Board of School Directors*, 616 F.2d 305 (7th Cir. 1980)........................................... 10

*Bickel v. Sheriff of Whitley*, 08-CV-102 (N.D. Ind.) ........................................................ 13, 18, 24

*Bistrian v. Levi*, 696 F.3d 352 (3d Cir. 2012) ................................................................. 18

*Bynum v. D.C.*, 412 F. Supp. 2d 73 (D.D.C. 2006) ........................................................ 25

*Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*,
    897 F.3d 825 (7th Cir. 2018) ................................................................................ 22

*Carey v. Piphus*, 435 U.S. 247 (1978) ...................................................................... 17, 18

*Charvat v. Valente*, No. 12-CV-05746, 2019 WL 5576932 (N.D. Ill. Oct. 28, 2019) .............. 18, 28

*Chicago Acorn v. City of Chicago*, No. 97-6391, 1999 WL 1256260
    (N.D. Ill. Dec. 21, 1999) .................................................................................... 25

*Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998)................................................................ 27

*County. of Riverside v. McLaughlin*, 500 U.S. 44 (1991)........................................... 2, 17, 18

*Craftwood Lumber Co. v. Interline Brands, Inc.*, 11-cv-4462, 2015 WL 1399367
    (N.D. Ill. Mar. 23, 2015) .................................................................................... 28

*Donovan v. Sheriff of St. Joseph*, No. 11-133 (N.D. Ind.)................................................... 24

*Dunn v. City of Chicago*, No. 04-CV-6804 (N.D. Ill.) ................................................... 13, 23

*Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872 (7th Cir. 2012) ..................................... 27

*Flood v. Dominguez*, No. 08-CV-153 (N.D. Ind.).......................................................... 13

*Flood v. Dominguez*, 270 F.R.D. 413 (N.D. Ind. 2010) ................................................... 17

*In re Abbott Labs. Sec. Litig.*, No. 92-C-3869, 1995 WL 792083 (N.D. Ill. July 3, 1995)............... 26

*In re Comdisco Securities Litigation*, 150 F.Supp.2d 943 (N.D. Ill. 2001)...................................... 26

*In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) ................................................. 22

iii

*In re Synthroid Marketing Litigation*, 264 F.3d 712 (7th Cir. 2001) ......................................... 22, 27

*In re Trans Union Corp.*, No. 00-C-4729, 2009 WL 4799954 (N.D. Ill. Dec. 9, 2009) ............... 26

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996) ......................................................... 9, 10, 20

*Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir. 1986) ................................................... 23, 25

*Myatt v. Allen County*, 10-CV-64 (N.D. Ind.) .................................................. 14, 18, 24

*Nilsen v. York County*, 400 F.Supp.2d 266 (D. Me. 2005) ............................................ 23

*Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277 (7th Cir. 2002) ..................................... 20

*Robinson v. City of Harvey*, 489 F.3d 864 (7th Cir. 2007) ........................................... 25

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011) .................................. 28

*Silverman v. Motorola Sols., Inc.*, 739 F.3d 956 (7th Cir. 2013) .................................... 22

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646 (7th Cir. 2006) .................. 9, 20

*Taifa v. Bayh*, 846 F. Supp. 723 (N.D. Ind. 1994) ................................................ 12, 20

*Taubenfeld v. AON Corp.*, 415 F.3d 597 (7th Cir. 2005) .............................................. 23

*Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830 (E.D. La. 2007) ................................. 23

*Wilson v. Seiter*, 501 U.S. 294 (1991) ............................................................. 18

*Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629 (7th Cir. 2011) ............................... 26

*Wright v. Clark County*, No. 14-27 (S.D. Ind.) .................................................... 24

*Wright v. Rodden*, No. 14-CV-27 (S.D. Ind.) .................................................. 13, 18, 24

**Statutes and Rules**

FRCP 23(e)(2) .......................................................................................... 9

FRCP 23(e)(2)(C)(iv) .................................................................................. 15

FRCP 23(h) ............................................................................................ 22

**Secondary Sources**

Manual for Complex Litigation, § 21.62 ......................................................................... 12

*Coronavirus outbreak: Hundreds of infected, quarantined inmates in prisons and jails challenging officials*, USA Today, April 9, 2020 (accessed at https://www.usatoday.com/ on April 25, 2020) .........................................................................................................15

*The COVID-19 Struggle In Chicago's Cook County Jail, NPR,* April 13, 2020 (accessed at https://www.npr.org/ on April 27, 2020) .......................................................................15

*'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars, New York Times,* March 30, 2020 (accessed at https://www.nnytimes.com/ on April 20, 2020) .........................15

*Study: COVID-19 Is Also Spread by Fecal-Oral Route,* https://www.medpagetoday.com/ (last accessed April 27, 2020) ...................................................................................... 14

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27 (Mar. 2004) ...................................... 23

World Health Organization, *Covid Prevention*, https://www.who.int/health-topics/coronavirus#tab=tab_2 (last accessed April 27, 2020) ......................................15

Pursuant to Fed. R. Civ. Proc. 23(e), this motion seeks final approval of the settlement (Class Action Release and Settlement Agreement, Ex. 1, Dkt. # 62-1) reached in this case after a year-and-a-half of litigation and months of protracted and contentious negotiations between the parties and with the invaluable assistance and supervision of Magistrate Judge Young B. Kim. The settlement provides significant monetary relief for the affected Classes ($2 million), protects future detainees' constitutional rights, and perhaps more importantly for the times we are now living in, forced the Will County Sheriff to institute potentially life-saving sanitary procedures in the Will County Adult Detention Facility's booking cells prior to the United States' coronavirus outbreak. Further, pursuant to Rule 23(h) and Rule 54(d)(2), Class Counsel moves for an award of attorney's fees and reimbursement of costs and expenses. Finally, pursuant to the common law of this circuit, class representative Andrea Dunn moves the Court for an incentive award to acknowledge her indispensable role in bringing this suit that benefitted the two classes here so greatly.

Class representative Andrea Dunn and Class Counsel highly recommend this settlement as being in the best interest of the class and move the Court for final approval of the settlement. The class appears to agree. After having received the court-ordered notice, individually mailed to each class member's last known address along with it being published in three newspapers and online, the class of approximately 10,000 members has not submitted a single objection. That is unsurprising: this settlement provides significant monetary compensation to each class member and ends the practices that led to the alleged constitutional violations at issue here. This is the hallmark of an excellent settlement that deserves the Court's approval.

1

## BACKGROUND

Andrea Dunn was arrested without a warrant in September 2017 and spent a total of 55 hours in the Will County Adult Detention Facility (referred to as the jail or the ADF) booking cells, which were built to house arrestees for short periods of time, prior to receiving an initial judicial hearing where a judge was presented with the issue of the probable cause of her arrest. (Am. Class Action Cmplt., Dkt. 29 at ¶ 24.) During her detention, Ms. Dunn was deprived of a mattress upon which to sleep, soap with which to wash her hands, even after using the toilet which was located within the cell with several other detainees, and other basic sanitary objects. (*Id.* at ¶¶ 13-21.) Ultimately, all charges against Ms. Dunn were dismissed. (*Id.* at ¶ 24.)

Ms. Dunn approached counsel about her treatment, and they conducted a months-long investigation into the underlying facts and law governing this matter. (Heffner Decl., Ex. 2, at ¶ 3-4.) As a result, Class Counsel filed this case in September 2018, seeking to represent multiple classes of persons detained at the jail. (Cmplt., Dkt. 1.) The Complaint alleged Ms. Dunn and hundreds or thousands of other jail detainees had been held an unreasonable amount of time prior to a judicial determination of probable cause, in violation of the 4th Amendment as interpreted by the Supreme Court in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). (*Id.* at ¶¶ 27-30, 38-44). Furthermore, the Complaint challenged the conditions of confinement in the jail's booking cells for those held for prolonged periods of time—specifically, challenging the lack of soap, toothpaste and toothbrushes, ability to bathe, and the ability to sleep for detainees held overnight.(*Id.* at ¶¶ 32-37, 57-60.) Ultimately, Class Counsel requested two classes be certified for this litigation: (1) a class of individuals held in the jail overnight in alleged unconstitutional conditions of confinement in the booking-cell area; and (2) a class of individuals arrested without

a warrant and held over 48 hours without a probable-cause hearing. (Pltf.'s Am. Mtn. for Class Cert. and Appt. of Class Cnsl., Dkt. # 36 at 5.)

In response to the initial complaint, the Defendants moved to dismiss certain allegations and claims, while answering others. (Dfts' Mtn. to Dismiss, Dkt. 15 & 17.) This Court granted Defendants motion to dismiss certain allegations on May 2, 2019. (May 2, 2019 Mem. Op., Dkt. 32.) In the meantime, the parties exchanged initial disclosures and the Plaintiff deposed Dave Adams, a Rule 30(b)(6) witness for the Will County Sheriff's office, regarding: (1) the conditions of confinement at the ADF and (2) the procedures and considerations used by the Sheriff's department to admit, place, and release detainees arrested without a warrant and awaiting a probable cause hearing. (Ex. 2 at ¶ 5.)

Plaintiff first moved for class certification on April 26, 2019, and subsequently amended that motion. (Dkt. 30 & 36.) The Court then referred this matter to Magistrate Judge Kim for settlement discussions in May 2019. (Dkt. 39.) The parties held multiple negotiation sessions with Magistrate Judge Kim, in conjunction with further discovery responses and party-to-party negotiation. (Ex. 2 at ¶ 6.) Finally, after six months of adversarial and protracted negotiations and settlement drafts, the parties agreed to the settlement agreement proposed here on December 2, 2019. (Ex. 1.) This Court preliminarily approved the settlement agreement and certified the two settlement classes on January 23, 2020. (Dkt. 65.)

One of the proposed terms of the settlement agreement was further confirmatory discovery. (Ex. 1 at ¶¶ 26-27.) Class Counsel used that provision to validate the class size of each proposed settlement class by further investigating the raw data related to each arrest, how it was

compiled, and how it was maintained. This culminated in a second Rule 30(b)(6) deposition of

the Will County Sheriff's office, this time regarding these issues. (Ex. 2 at ¶ 7.)

**The Proposed Settlement Agreement**

The significant and relevant terms of the Settlement Agreement are as follows:

**The Settlement Classes**

The two settlement classes are defined as follows:

Settlement Class I is defined as:

> All persons detained at the Will County Adult Detention Facility between
> September 14, 2016 and the date of execution of this Agreement, and who were
> detained in a booking cell for more than 24 hours or who were detained in a
> booking cell throughout the period of 10:00 p.m. on one day through 6:00 a.m. the
> following day.

(Ex. 1. at ¶ 10(a).) There are approximately 10,500 members of this class.

Settlement Class II is defined as:

> All persons detained at the Will County Adult Detention Facility between
> September 14, 2016 and the date of execution of this Agreement, who were
> arrested without an arrest warrant or other judicial process, and who were not
> released within 48 hours of their arrest or who did not receive a judicial
> determination of probable cause within 48 hours of their arrest.

*Id.* at ¶ 10(b). There are approximately 400 members of this class.

**Settlement funds and plan of allocation**

The proposed Settlement Agreement creates a Settlement Fund of $2 million to pay

compensation to class members, administer the fund, pay notice costs, and pay attorney's fees

and costs. (*Id.* at ¶ 13.). There will be no reversion of any funds to Defendants. (*Id.* ¶ 14.)

Defendants have deposited $100,000, after this Court granted preliminary approval, to fund

4

notice and settlement-administration costs. (*Id.* at ¶ 13; Ex. 2 at ¶ 8.) Defendants will deposit the remaining amounts within 30 days of the entry of the Final Approval order. (Ex. 1 at ¶ 13.)

The Plan of Allocation, previously proposed to this Court and disclosed on the Settlement Administrator's website, divides the fund – net of notice costs, administration, incentive award, attorney's fees and expenses, and other Court-approved disbursements – into two sub-funds available to pay claims. (Ex. 3 at ¶¶ 7-10.) Assuming expected notice and administration costs are incurred and a typical fee of 33% is awarded, approximately $800,000 would be distributed to the much larger Class I and $400,000 distributed to Class II. Class II— comprised of approximately 400 people—would have its claims payed pro rata (an equal amount per person) and would be capped at $5,000. Any amounts in excess of that cap would be reapportioned to pay Class I claims. (*Id.* at ¶ 9.) Class I's claims would be paid proportionally based on the amount of time spent in the jail's holding cells and based on the conditions of confinement at that time.  (*Id.*)

### Non-monetary compensation

The Settlement Agreement also results in substantial policy changes to protect the rights of future detainees at the jail. (Ex. 1 at ¶¶ G-K.) For example, as a result of this suit and as insisted upon by Plaintiff and Class Counsel as a condition precedent of any settlement, the state court sitting in Will County will create and enforce a circuit court administrative rule that requires all warrantless arrestees to receive a judicial determination of the probable cause for their arrest within 48 hours of that arrest, barring exigent circumstances or an emergency. (*Id.* at ¶ 18.) Prior to this suit, no such order existed and the court did not monitor this issue.

Further, the Sheriff's Office will establish and implement the Policies and Procedures set forth in Ex. 1-A, while also amending the WCADF Inmate Handbook. (*Id.* at Ex. A.) These changes provide real, substantive protections to future detainees at the jail by providing for: (1) hygiene kits (toothbrush, toothpaste, soap, towel, and sanitary napkins), (2) a mattress and blanket, (3) showers for those held for more than 24 hours, and (4) dimming of cell lights from 10 pm to 6 am. (*Id.*)

And the implementation of these changes will be monitored by Magistrate Judge Young B. Kim, with the assistance of the parties. (*Id.* at ¶¶ 20-24.) He shall receive and analyze information regarding the Sheriff's Office's compliance with the non-monetary terms of the Settlement Agreement, assess and make findings regarding such compliance, and enter appropriate orders to ensure both compliance and adequate monitoring of compliance. Beginning 90 days following Final Approval, and every 90 days thereafter, the Sheriff's Office shall provide the Monitor and Class Counsel a written report ("Quarterly Report"), which shall include the status of implementation of each of the non-monetary provisions of this Settlement Agreement. (*Id.* at ¶ 21.) The Quarterly Reports shall include the following information:

    a.    the number of warrantless arrestees detained at the jail, since the date of Final Approval or since the date of the last Quarterly Report (whichever is later), who were not afforded a probable-cause hearing within 48 hours of the time of arrest, including the names of any such arrestees, dates and times of arrest, detention, and hearing, including specific circumstances that led to each such incident;

    b.    the status of the facility modifications and provision of bedding as set forth in the Agreement;

    c.    the status of the modification of existing policies and procedures and adoption of new policies and procedures as set forth in the Agreement, copies of which shall be provided to the Monitor and to Class Counsel; and

      d.      the status of any rules changes by the Circuit Court relating to the timing or schedule for initial court appearances, copies of which shall be provided to the Monitor and to Class Counsel.

(*Id.*)

### Notice, opt-outs, and objections

Pursuant to this Court's order preliminarily approving the settlement, Class Counsel provided notice to class members both by direct mailed notice and by publication in three area newspapers. (Dkt. 69 at ¶¶ 4-5.) The settlement administrator worked to confirm addresses prior to the initial mailing from the list provided by Defendants. This was completed and mailed on February 20, 2020. (*Id.* at ¶ 4.) Despite the administrator's efforts to determine accurate addresses, approximately 1,650 – or 18.7% – were returned as undeliverable. (*Id.* at ¶ 7.) Only 14 were able to be redelivered with addresses obtained from the U.S. Postal Service. (*Id.*) To ensure the broadest possible notice, the administrator also published notice in the Chicago Tribune, the Herald-News, and the Joliet Patch on February 18, 2020. (*Id.* at ¶ 5.) Due to an error—where the year was listed as 2019 instead of 2020—the administrator published the notice again in these publications to ensure the notice was accurate. (*Id.*) A website with all of the information about this case, including claim forms, has been operating since February 18, 2020. (*Id.* at ¶ 6.)

Settlement Class members were given 60 days from the publication-notice date to request exclusion from the Settlement Classes or to file an objection to the Settlement Agreement. (Dkt. 65 at ¶ 15(b).) To date, only one class member has requested exclusion and none have objected to the terms of the settlement or the noticed requested amount of attorney's fees or incentive award. (Ex. 4, Suppl. Decl. of Cornelia Vieira, at ¶ 5-6.)

**Release of claims**

The settlement provides that all members of the Settlement Classes who have not properly or timely excluded themselves will release the Defendants from any and all claims, demands, rights, causes of action, compensatory and punitive damages, attorney's fees and costs arising out of or in any way related to the allegations raised in this case. (Ex. 1 at ¶ 25.)

**Named plaintiff incentive award and attorney's fees**

The settlement allows for the Named Plaintiff to request an incentive award of up to $25,000 in cash, subject to the Court's approval, to be paid from the Settlement Administration Fund. (*Id.* at ¶ 16.) The Settlement Agreement further provides that Class Counsel may petition the Court for an award of their actual costs incurred in this litigation in addition to a fee of up to 33% of the Settlement Fund. (*Id.* at ¶ 15.)

## ARGUMENT

**I.** **The Court should approve the settlement because it is fair, reasonable, and adequate.**

The Court's decision to grant approval to a class-action settlement is governed by FRCP 23(e)(2). That rule allows the court to approve a class-action settlement only on a finding "that it is fair, reasonable, and adequate after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other."

FRCP 23(e)(2).

In addition, courts in the Seventh Circuit traditionally consider the following five factors: (1) the strength of the plaintiffs' case compared against the amount of the defendants' settlement offer; (2) the complexity, length, and expense of continued litigation; (3) the amount of opposition to the settlement; (4) the opinion of experienced counsel; and (5) the stage of the proceedings and the amount of discovery completed. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006) (internal citation omitted). In analyzing all these factors, the Court should be mindful that "(f)ederal courts naturally favor the settlement of class action litigation,"*Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996), and so must review the facts "in the

light most favorable to the settlement," while evaluating the fairness of the settlement in its entirety, rather than its component parts. *Isby*, 75 F.3d at 1199 (quoting *Armstrong v. Board of School Directors*, 616 F.2d 305, 315 (7th Cir. 1980)).

With this in mind, Plaintiff submits the settlement here easily satisfies all of the relevant requirements of FRCP 23(e) and Seventh Circuit precedent.

### A. Andrea Dunn, Heffner Hurst, and the Law Office of Jordan Marsh have vigorously and successfully represented the classes through investigation, litigation, and settlement negotiations.

Class Counsel and the class representative have clearly adequately represented the class. Class Counsel spent months investigating and researching Ms. Dunn's claim prior to filing the complaint in this action in September 2018. After that point, Class Counsel litigated a motion to dismiss, and conducted written and oral discovery. Class Counsel then researched, drafted, and filed a motion for class certification that led directly to the defendant sheriff requesting settlement negotiations in front of Magistrate Judge Kim. From the beginning, both Class Counsel and Ms. Dunn insisted that any resolution of this case must include significant, real policy reforms at the ADF to ensure the constitutional violations at issue in this case would never occur again. *See generally*, Ex. 2.

Settlement negotiations began in earnest in June 2019, and continued through November. Over the course of those five months, with the assistance of Magistrate Judge Kim, Class Counsel worked diligently to reach a resolution that encompassed both (1) adequate financial compensation for the Class members, and (2) physical and programmatic reforms at the jail to address the alleged constitutional violations Plaintiff for all future detainees. *See Id.*; Ex. 1.

Through their efforts, Class Counsel have now achieved an excellent settlement. The settlement creates a common fund of $2 million to distribute to those class members detained in booking cells at the ADF during the class period. Maybe more importantly, Class Counsel have achieved significant policy reforms both within the ADF that has (1) retrofitted cells to accommodate sleeping accommodations, including mattresses and blankets, (2) provided sanitary items to detainees in the booking area—including soap in the washrooms and cells—as a matter of policy, (3) mandated showers for detainees held beyond 24 hours, and (4) dimmed the lights for booking area cells at night. *See generally* Ex. 1. Moreover, the 12th Judicial District court in Will County has agreed to enter a standing order that guarantees probable cause hearings within 48 hours of arrest for all detainees and requires at least one judge to remain on call on Sundays to satisfy this order. *See* Ex. 6, 12th Judicial Circuit Court Administrative Order No. 19-23. (Class Counsel's success in securing the commitment from the state court is particularly notable given that the court was not yet a defendant in this matter).These reforms will protect the 4th Amendment rights of all Will County citizens or anyone else subject to arrest within that county.

In addition to the efforts discussed above, Class Counsel is continuing their work to operationalize the settlement, and to ensure that the settlement funds are distributed properly and that the agreed-upon reforms will materialize consistent with the Settlement Agreement. Class Counsel has been working with the claims administrator to set up a website for claims, containing all relevant documents, and allowing claimants to access notice and claim forms online. Ex. 2 at ¶ 17. Over the next year, Class Counsel will work with Judge Kim (as the

monitor) and Defense Counsel to verify compliance with the Settlement Agreement through quarterly status reports, as outlined in ¶¶ 20-24 of the Settlement Agreement.

In sum, then, Class Counsel has so far devoted more than 600 hours to the case, Ex. 2 at ¶ 12 and Ex. 5 at ¶ 7-9, successfully navigating the complex interplay between the Will County Sheriff's Office and the Will County Circuit Court to achieve an outstanding result for the class members and future detainees at the ADF.

### B. The settlement was negotiated at arm's length, with the assistance of a proactive, hands-on mediator in Magistrate Judge Kim.

There has been no allegation of any collusion between the parties and none could be made. The parties reached a settlement only after extensive, multi-day negotiations before Magistrate Judge Kim. Class Counsel conducted meaningful discovery prior to the mediation and the settlement was contingent upon satisfactory confirmatory discovery. Clearly, under these circumstances, there is no question but that the settlement was made at arm's-length with knowledge of all the facts. *See Taifa v. Bayh*, 846 F. Supp. 723, 728 (N.D. Ind. 1994) (approving prison conditions injunctive settlement even though "parties commenced settlement at an early state of [the] litigation" where "class counsel engaged in an extensive and thorough investigation of the background and facts pertinent to the claims"). Indeed, Magistrate Judge Kim's agreement to be involved in the future monitoring of compliance with the Settlement Agreement's terms, Ex. 1 at ¶¶ 20-24, is proof that he understands it was negotiated at arm's length. *See* Manual for Complex Litigation, § 21.62, at 316 (listing the participation of a judge in the negotiations as one of the factors to consider in evaluating a proposed class action settlement).

**C. The settlement's relief is excellent—it creates a $2 million fund to compensate class members for the violation of their constitutional rights, guarantees the Will County Sheriff and courts seriously monitor the time spent in and conditions of confinement of the jail's short-term booking cells, and has already led to the provision of soap and other sanitary measures to combat the potential spread of infectious disease in the jail.**

Of the various Rule 23 (e) factors, the most important is the adequacy of the relief provided to the class. This settlement's relief is more than adequate.

First, the $2 million settlement fund is an excellent result for the class and provides meaningful compensation for the alleged violation of each class member's constitutional rights. Using the proposed Plan of Allocation, Ex. 3, assuming the attorney's fee award is approved, and assuming a very high 50% claims rate (the percentage of actual class members who respond with valid claims), each member of Class I (conditions of confinement) would average a recovery of $160 and each member of Class II (held over 48 hours prior to a probable cause hearing) would recover $1,932. (Obviously, class member's recovery will be much higher assuming a normal claims rate.) Compare that to similar settlements in this circuit. For example, these five approved settlements in the Seventh Circuit involved similar, although not identical, constitutional violations and resulted in much lower payouts to class members:

- *Dunn v. City of Chicago*, No. 04-CV-6804 (N.D. Ill.) (awarding up to $90 per overnight detention without bedding);

- *Flood v. Dominguez*, No. 08-CV-153 (N.D. Ind.) (awarding approximately $100 for being held 24 hours for conditions at the jail including no bedding);

- *Wright v. Rodden*, No. 14-CV-27 (S.D. Ind.)($19 to $22 per hour for each hour over 48 hours);

- *Bickel v. Sheriff of Whitley*, 08-CV-102 (N.D. Ind.)($43.83 per hour for each hour over 48 hours); and

13

- *Myatt v. Allen County*, 10-CV-64 (N.D. Ind.)($200 for individuals detained between 48 and 60 hours).

Given these numbers, this settlement here is clearly adequate.

Second, the settlement's future relief is extremely important. Many booking-cell detainees were held for over 12 hours, overnight, and are awaiting court hearings. Prior to this suit, though, those arrestees could not adequately sleep or practice adequate hygiene—such as washing one's hands (even after urinating or defecating) or brushing one's teeth. From now on, though, all detainees at the ADF will be provided hygiene packets, be able to sleep on mattresses overnight, and have the ability to properly wash one's hands. In addition, prior to this suit, the 12th Judicial District did not hold probable-cause hearings on Sundays, resulting in hundreds of people each year being denied their constitutional right to a prompt judicial determination of the probable cause for their arrest. Now, all those subject to the jurisdiction of the 12th Judicial District will receive a probable cause hearing within 48 hours, as the constitution requires.

Third, the settlement's policy changes have already resulted in a much safer jail in light of the current Covid-19 pandemic. As a direct result of this lawsuit, the Sheriff's office began providing soap and showers to detainees held in booking cells beginning in May 16, 2019. Imagine that Plaintiff had not brought this suit, had not pushed to change the conditions in the jail, and had not achieved success. That is, imagine in February and March of 2020 with Covid-19 sweeping the nation, a jail where detainees were crammed into booking cells for 48 hours or more at a time, using the same toilet and with no soap with which to wash their hands.[1]

---

[1] *See, e.g., Study: COVID-19 Is Also Spread by Fecal-Oral Route,* https://www.medpagetoday.com/ (last accessed April 27, 2020); World Health Organization, "Covid Prevention," https://www.who.int/health-topics/coronavirus#tab=tab_2 (last accessed April 27, 2020).  Without plaintiff's suit, no doubt the current pandemic would have been even

Fourth, all of the factors that must be taken into account[2], favor settlement:

### 1. The costs, risks, and delay of continued litigation favors approval of this settlement.

It would be a losing proposition for the Class Members to litigate further. Although Class Counsel built a strong record for proving liability, there is no doubt but that the Class still faced substantial cumulative risk in proceeding through summary judgment, jury trial, and appeal. Prior to trial, for example, the Court could have denied class certification or substantially changed the class definition leaving most class members with nothing. Or new facts might have changed the liability picture if continued discovery proceeded.

At trial, while Class Counsel believes its case on liability was strong, there is simply no telling how a jury would value the damages at issue here for staying in jail longer than constitutionally allowed by a few hours. Nor is there much guidance for how a federal jury would value the claims of arrested persons based on the lack of soap, mattresses, or other personal hygiene items for a few days. A nominal award, then, would certainly be possible. This settlement avoids that very real risk.

---

worse in Will County. *Cf.* "The COVID-19 Struggle In Chicago's Cook County Jail," NPR, April 13, 2020 (accessed at https://www.npr.org/ on April 27, 2020); "Coronavirus outbreak: Hundreds of infected, quarantined inmates in prisons and jails challenging officials," USA Today, April 9, 2020( accessed at https://www.usatoday.com/ on April 25, 2020); "'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars," New York Times, March 30, 2020 (accessed at https://www.nnytimes.com/ on April 20, 2020).

[2] FRCP 23(e)(C)(iv) asks the Court to evaluate the fairness of "any agreement required to be identified under Rule 23(e)(3)" between the parties separate and independent of the settlement agreement. The parties have no such side agreements; all the parties' agreements are documented in the Settlement Agreement.

Even if plaintiffs succeeded at trial, though, the defendants would no doubt appeal. On appeal, it is anybody's guess as to what the Seventh Circuit would do with this case. But just as important, further delay is costly and should be avoided. At least a year's worth of pretrial litigation would be necessary if this settlement were not approved, followed by a trial and an appeal that would last at least another year. Class Counsel suggests this delay should not be discounted, especially with the risk of a nominal damage award by a jury.

### 2. The effectiveness of the proposed distribution method favors approval of this settlement.

The proposed distribution method clearly favors approval of this settlement. Distribution will be accomplished by sending checks for the settlement awards to each class member directly at the address each member has given as their present one after receiving their simplified claim form. Class members will have 90 days to cash their checks, at which point, it is possible they can apply for more time to cash their check or inquire as to the process. Further, the distribution between class members and the claims processing is completely transparent, proportional, and favors the class members. *See generally,* Ex. 3, Plan of Allocation; Ex. 4, Suppl. Decl. of Cornelia Vieira. No money is targeted for a *cy pres* distribution, for example.

### 3. The terms and timing of the proposed attorney fee award favors approval of this settlement.

As discussed in Section II, below, the terms of the proposed attorney's fee award are completely reasonable in light of governing Seventh Circuit precedent, the quality of representation, and the excellent results achieved. In addition, there are no suspicious or questionable timing issues regarding the payment of the fee (no part of it was paid prior to final approval, for example). As such, this factor favors approval of the settlement.

16

**D. The settlement treats class members equitably with respect to each other.**

The Plan of Allocation calls for Class I to receive two times the net allocation amount as Class II. *See* Ex. 3 at ¶¶ 7-10. It apportions settlement amounts between Class I members proportionally based on (1) the time spent in the jail's booking cells, and (2) the conditions in those cells on the dates the detainee was held. *Id.* at ¶ 9. And Class II's settlement amounts are allocated pro rata, with each claim worth the same settlement amount. *Id.* at ¶ 7.

The division between Class I and Class II is fair and equitable because Class II's claims are better legal claims than Class I's. While Class I is much larger than Class II—approximately 10,000 vs. 400—Class II's claims are better established within the law and the violation alleged here was more egregious. Class II's claim is for excessive detention without a probable cause hearing (commonly referred to as a *Gerstein* claim) and is governed by the 4th Amendment's prohibition on unreasonable seizures of a person, discussed at length in *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 53 (1991). Class I's claims, by comparison, related to a much more amorphous concept of unconstitutional conditions of confinement, and are governed by both the 4th and 14th Amendments. *See, e.g.*, *Flood v. Dominguez*, 270 F.R.D. 413, 415 (N.D. Ind. 2010). The standard of proof and the damages for each constitutional harm are unique. *See Bistrian v. Levi*, 696 F.3d 352, 374 (3d Cir. 2012); *Carey v. Piphus*, 435 U.S. 247, 258–59 (1978) ("In order to further the purpose of § 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question."). While there is no mathematically precise formula, the settlement's Plan of Allocation, Ex. 3, divides the settlement fund based on the strength of the respective claims and the associated damages.

17

Generally speaking, *Gerstein* claims are easier to prove than conditions-of-confinement because *Count of Riverside* established a rebuttable presumption that a detention without a probable cause hearing is unconstitutional if it lasts longer than 48 hours. *See County of Riverside*, 500 U.S. at 57. In contrast, a conditions-of-confinement claim can require a showing of deliberate indifference by officials. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). And while damages for both claims are difficult to determine, historically, *Gerstein* claims have a higher settlement value than conditions-of-confinement claims similar to those alleged here. (Ex. 2 at ¶ 4.)

That said, Class II should not receive windfalls if the claims rate is very low. For example, if only 10% of Class II submits a claim, those members would each receive $10,000, while a Class I member would receive hundreds of dollars. To safeguard against this, the Plan of Allocation caps Class II claims at $5,000. This is still an excellent recovery, *cf. Wright v. Rodden*, No. 14-CV-27 (S.D. Ind.)($19 to $22 per hour for each hour over 48 hours); *Bickel v. Sheriff of Whitley*, 08-CV-102 (N.D. Ind.)($43.83 per hour for each hour over 48 hours); *Myatt v. Allen County*, 10-CV-64 (N.D. Ind.)($200 for individuals detained between 48 and 60 hours), but a cap is justified to prevent wildly out of proportion recoveries. *See Charvat v. Valente*, No. 12-CV-05746, 2019 WL 5576932, at *6 (N.D. Ill. Oct. 28, 2019)(finding decision to cap recoveries a "reasonable way of ensuring that every individual claimant has the best possible payout").[3]

---

[3] By definition, a member of Class II is also a member of Class I, so individuals may recover under both classes since each class represents a separate constitutional harm. These are separate constitutional harms with separate damages. *See Bistrian v. Levi*, 696 F.3d 352, 374 (3d Cir. 2012); *Carey v. Piphus*, 435 U.S. 247, 258–59 (1978). And unlike Class II, there is no cap on Class I claims, assuring virtually all of the net settlement fund (minus attorney's fees, expenses, and administration costs) will be distributed to class members. *See* Ex. 3 at ¶ 9.

Furthermore, Class I class members are all treated equitably under the Plan of Allocation as compared to each other. Each Class I member's recovery will be calculated based on (1) the length of time held in the jail's booking cells, and (2) the particular conditions in the booking cells on the dates in question. With respect to the first factor, the longer a class member was held in the allegedly unconstitutional conditions, the greater their proposed recovery. This makes sense because the longer one was exposed to the conditions, the greater their damages. The second factor takes into account that the Sheriff's office began issuing hygiene kits (soap, toothbrushes, toothpaste, and sanitary napkins) starting on May 16, 2019 in response to this lawsuit. Ex. 2 at ¶ 7. This alleviated part, but not all, of the conditions-of-confinement claims. But members of Class I who were detained in the ADF from May 16, 2019 to December 2, 2019, no doubt were held under better condition—and therefore are entitled to a lower settlement amount less—than other members of Class I. The Plan of Allocation accounts for this by applying a .67 multiplier on time spent under the better conditions. Ex. 3 at ¶ 9-10. In short, this plan provides the greatest compensation to those who spent the longest time, under the respectively worse conditions.

Class II claims will be allocated between each on a pro rata basis, with each person receiving the same amount. *Id*. at ¶ 7-8. This is equitable because the range in time Class II members were held over 48 hours is very small (within a few hours). Rather than spend time and money to create set of arbitrary and meaningless distinctions between someone held 50 hours vs. someone held 52 hours, Class Counsel submits a pro rata distribution is fair and equitable in these circumstances, especially given the substantial amount of reach recovery.

E. **The settlement satisfies all the traditional Seventh Circuit factors used in evaluating the fairness, reasonableness, and adequacy of a class-action settlement.**

All of the traditional factors that Seventh Circuit courts have used to evaluate a class-action settlement's fairness support the Court's approval of this settlement.

First, the defendant's settlement offer is a good one in light of the plaintiff's case. Under the Seventh Circuit's approach to this factor, the Court must "quantify the net expected value of continued litigation to the class." *Synfuel*, 463 F.3d at 653, *quoting Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002). To do so, the Court should "estimat[e] the range of possible outcomes and ascrib[e] a probability to each point on the range." *Id.* Although "[a] high degree of precision cannot be expected in valuing a litigation," the Court should determine a "ballpark valuation." *Id.* Here, Class Counsel submits that a $2 million settlement with significant and permanent future relief for the Class and the public at large is well within "the range of possible outcomes" in this case. There is simply no telling what a jury would do in valuing damages here.

Second, as discussed above, the complexity, length, and expense of continued litigation is high. *See* Section I.C.1, *supra*.

Third, there is no recorded opposition to the settlement. Ex. 4 at ¶ 6. Given the large size of the class and the number of individual notices that were mailed, it is telling that no one has objected to the settlement. *Cf. Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996) (13% of jail conditions class members submitted written objections to settlement; settlement approved); *Taifa v. Bayh*, 846 F.Supp. 723, 724-25 and 728 (N.D. Ind. 1994) (more than 10% of the prisoners

in the Indiana Maximum Control Complex opposed settlement of a suit concerning conditions at the prison; settlement approved).

Fourth, Class Counsel here are very experienced in both class-action litigation and § 1983 litigation and whole-heartedly support the settlement. Heffner Hurst has practiced almost exclusively in the field of class action litigation for the past 20 years, has served as lead trial counsel in this district, and has been a co-chair of the ABA's Section of Litigation Class Action and Derivative Suit Committee section devoted to Rule 23. *See* C.V of Heffner Hurst attached to Ex. 2. Further, both Class Counsel have significant experience litigating Section 1983 civil-rights cases. *Id.* and Ex. 5. at ¶ 2. Co-Class Counsel wholeheartedly support this settlement given the risks of loss and delay, the future cost of litigation, and the immediate substantial relief awarded in this settlement, as documented throughout.

And fifth, the case has matured to the point where settlement is made with a clear understanding of the probable facts to be shown at trial and the risks and rewards of continued litigation.  The parties have engaged in multiple rounds of briefing regarding the pleadings, resulting in a honing of the claims and have engaged in meaningful discovery and negotiations over the last two years. That is more than enough to satisfy this requirement.

**II.      The Court should award Class Counsel 33% of the settlement recovery as attorney's fees under FRCP 23 (h) in light of the substantial monetary recovery and significant non-monetary relief they achieved for the classes.**

Class Counsel have spent nearly two years working on this case without compensation and at a risk of losing all the time and money they invested into this case. FRCP 23(h) allows the Court to award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement.  Class Counsel request a fee of 33% of the $2 million common fund they created plus reimbursement of out-of-pocket expenses, and as argued below, that fee is supported by the parties' agreement and Seventh Circuit precedent.

In determining the fairness of a attorney's fee in the percentage-of-the-fund method, the district court is required to analyze what fee arrangement the parties would have bargained for at the outset of litigation based on a percentage of the plaintiffs' possible recovery. *See Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957–58 (7th Cir. 2013). To do that, the Court must investigate what "the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Marketing Litigation*, 264 F.3d 712, 718 (7th Cir. 2001). The goal in awarding a reasonable attorney's fee award in this context "is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992).

In addition to the prevailing market rates, the Court may also look to the value of the settlement to the class, the risk of nonpayment, the quality of the attorney's performance, the amount of work necessary to resolve the litigation, and the stakes of the case. *Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 833 (7th Cir. 2018). Given all these factors, this fee request is fair and reasonable: it is actually below-market for fees in similar cases, where

risk is high and opponents have the unlimited resources of a governmental entity for defense, and represents a suitable risk premium for Class Counsel given the actual time and expense expended in this case.

**A. A fee of 33% is below market for contingency representation in § 1983 class action litigation.**

Civil-rights practitioners understand that the standard civil-rights contingency percentage in this district is 40% of the recovery. *See Dunn v. City of Chicago*, No. 04-6804 (N.D. Ill), at Dkt. 348-6. *Cf. Kirchoff*, 786 F.2d at 323-24 (stating that a 40% contingency fee is typical in many areas of the law but that the particularly unlevel playing field confronting civil right plaintiffs may make a market rate of greater than 40% reasonable). And here, Ms. Dunn agreed up front that 33% of any recovery was reasonable in this case. Ex. 2 at ¶ 3.

More generally, there is a wealth of data that shows that Class Counsel's requested fee of 33% is below-market for comparable cases. For example, the largest empirical study of class action settlements shows that the mean fee in civil-rights class actions is a more generous 37%. *See* Ex. 7, Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27, 51 (Mar. 2004) (published opinion data showing the mean civil rights percentage award was 37%); *See also, Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005) ("Although is it impossible to know *ex post* exactly what terms would have resulted from arm's-length bargaining *ex ante*, courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions."); *Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 864 n.30 (E.D. La. 2007) (noting that using Eisenberg and Miller's data sets for determine an average percentage for similar cases is comparable to the

"'market-mimicking' approach employed by the Seventh Circuit."); *Nilsen v. York County*, 400 F.Supp.2d 266, 281 (D. Me. 2005) (Civil rights class action fee opinion recognizing that "[m]edian attorney fee awards in other class actions generally (*i.e.*, not limited to strip searches) range within a few percentage points on either side of 30%.").

More specifically, fee awards in excessive-detention class actions also demonstrate the reasonableness of the 33% request—with many awarding fees in excess of 33%. *See*, *e.g.*, *Wright v. Clark County*, No. 14-27 (S.D. Ind.) at Dkt. 115 (awarding 37.5% in excessive detention); *Donovan v. Sheriff of St. Joseph*, No. 11-133 (N.D. Ind.) at Dkt. 93 (awarding 40% in excessive detention). In sum, the market rate for attorney services in like cases is typically much higher than what Class Counsel request here.

**B. The value of the settlement to the class, the risk of nonpayment, the quality of the attorney's performance, the amount of work necessary to resolve the litigation, and the stakes of the case all auger in favor of a higher than market-rate fee, not a lower one.**

There is no reason for the Court to award Class Counsel a lower-than-market rate based on the quality of the settlement or Class Counsel's work, either. The value of the settlement to the class and the stakes of this case clearly justify the fee request. The monetary settlement alone—of $2 million—will possibly result in a record per-person recovery for the types of claims at issue here in the Seventh Circuit. *Cf. Wright v. Rodden*, No. 14-CV-27 (S.D. Ind.)($19 to $22 per hour for each hour over 48 hours); *Bickel v. Sheriff of Whitley*, 08-CV-102 (N.D. Ind.)($43.83 per hour for each hour over 48 hours); *Myatt v. Allen County*, 10-CV-64 (N.D. Ind.)($200 for individuals detained between 48 and 60 hours). That alone justifies the fee request.

But the settlement does much more than just compensate class members for their past injuries; it also has changed the orders and policies of the 12th Judicial District with respect to the

timing of probable cause hearings as required by the Fourth Amendment and changed the policies at the Will County jail to provide detainees better hygiene, the chance to sleep while detained for days, and the guarantee that these changes will last indefinitely into the future. These reforms signify a great benefit to both the class and the public at large, which this Court should take into account in awarding the fee. *See, e.g.*, *Robinson v. City of Harvey*, 489 F.3d 864, 872 (7th Cir. 2007) (affirming fee award recognizing that counsel served the public interest by exposing governmental institutional failures); *Chicago Acorn v. City of Chicago*, No. 97-6391, 1999 WL 1256260, at *9 (N.D. Ill. Dec. 21, 1999) (awarding fees recognizing plaintiffs' policy achievement in obtaining non-discriminatory, content-neutral policy for admission to city council meetings as significant achievement that served and important public purpose); *Bynum*, 412 F. Supp. 2d at 85 ("The policy achievements obtained through this litigation set it apart from many class fund cases, which provide only monetary relief.").[4]

In analyzing the risk of non-payment and the amount of work necessary in this case, it is also clear the fee requested is reasonable. Civil rights cases, such as this one, carry with them an unusually high amount of risk and are worthy of a much higher risk premium. Unlike in securities cases where multiple plaintiffs and firms compete to lead the case because of a recognized financial opportunity, lawyers rarely duke it out over leading § 1983 cases, let alone those that seek to vindicate the rights of arrested persons or prisoners. *Cf. Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("Litigants under § 1983 [] have a harder time on the merits, and recover less when they win, than plaintiffs in much other tort litigation. The observation that a contingent fee

---

[4] Regarding the quality of Class Counsel's work, the undersigned will let the results speak for themselves. However, we would note that we are very proud of the results achieved in this case.

of 1/3 or 2/5 of the recovery fetches adequate counsel in FELA and products liability suits therefore does not demonstrate that the same percentage is the "market rate" in riskier, lower-stakes litigation under § 1983.").

And the amount of work necessary to achieve the results here was significant. Over the last two years of litigation, Class Counsel expended more than 600 hours of professional time without being compensated. The requested fee, then, accounts for a risk premium of roughly 2.1, which is completely in line with Seventh Circuit precedent. *See, e.g., Comdisco*, 150 F.Supp.2d at 948 (finding it subjective to rely on multipliers of between 2.0 and 7.0 as evidence that the market rate is unreasonable, instead using the standard of "enormously disproportionate"); *In re Abbott Laboratories Securities Litigation*, 1995 WL 792083, at *14 (multiplier of between 2.0 to 4.0 would not be too high).[5]

Given all these factors, then, Class Counsel submits that the 33% fee requested is fair and reasonable and should be approved by the Court.

### C. Class Counsel should be reimbursed for costs in the amount of $4,103.48.

In pursuit of the classes' rights, Class Counsel expended $4,103.48. *See* Ex. 2, Heffner Decl. at ¶ 15; Ex. 5, Marsh Decl. at ¶ 10. These expenses included filing fees, service of process, deposition transcripts, and some outside-plan legal research. Without these expenditures, this

---

[5] The same factors are at play in a "lodestar crosscheck," which analyzes the "rough lodestar" of counsel (amount of hours multiplied by their hourly rate) as enhanced by a risk multiplier. *See, e.g., In re Trans Union Corp.*, 2009 WL 4799954 at *6. And while it is useful to protect against fees wildly out of proportion to the amount of time spent on a case, a lodestar crosscheck should not be used to re-engineer the market rate discussed above. *See In re Comdisco Securities Litigation*, 150 F.Supp.2d 943, 949 (N.D. Ill. 2001). The Seventh Circuit has made clear, too, that a lodestar crosscheck is not required when analyzing a percentage-of-the-fund fee request. *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011).

case would never been filed, much less achieved the result it did. Accordingly, Class Counsel seeks reimbursement of all of these expenses from the Settlement Fund.

### III. Class representative, Andrea Dunn, should be awarded an incentive award for her efforts in bringing this action on behalf of the classes.

To encourage individuals to come forward to right wrongs, risk public embarrassment or harassment, and undertake potentially arduous and time-consuming litigation, courts frequently award class representatives a bonus award known as an "incentive award." *Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 875 (7th Cir. 2012); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001). In determining whether such an award should be given, the Court should consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

In this case, Dunn spent time and effort in meeting with Class Counsel, answering discovery, and reviewing the court filed pleadings and motions. Ms. Dunn is a layperson, though, and was obviously not a key player in the litigation tactics. So the amount of time she spent is not the most relevant consideration here.

Instead, the Court should focus on the risk Ms. Dunn took in filing suit and being named the class representative and named plaintiff here along with the outstanding benefit she has conferred on the class. Ms. Dunn is not a criminal and is not a prisoner with nothing to lose by filing suit. Remember, she was arrested and then had all charges dropped in the action that led to her detention at the jail. Yet she now has now alerted the world to the fact she was arrested and jailed by putting her name on this lawsuit and seeking justice for the people whose constitutional

27

rights were violated as alleged in this lawsuit. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 600 (N.D. Ill. 2011) ("Class Representative's willingness to publicly place their names on this suit and open themselves up to scrutiny and attention is certainly worth some remuneration"). Class Counsel can attest that such people who put their interest in justice being done over their own potential embarrassment are rare—the conditions at issue in this suit existed for at least a decade before Ms. Dunn stepped forward and no one had ever filed suit over it.

And given the results achieved, Ms. Dunn now deserves a meaningful award. Without her, this suit would have never been filed and the $2 million recovery, the policy changes that have ensured adequate hygiene in the booking cells prior to a world-wide pandemic, and the state court changes that ensure responsiveness to the 48-hour rule regarding probable cause hearings would have never been achieved. All of this justifies the requested $25,000 incentive award, which, while not as common as lower amounts, is amply supported by the results and reputational risk Ms. Dunn took. *See Charvat v. Valente*, No. 12-CV-05746, 2019 WL 5576932, at *10 (N.D. Ill. Oct. 28, 2019)(awarding $25,000 incentive fee for plaintiff with no reputational risk); *Craftwood Lumber Co. v. Interline Brands, Inc.,* 11-cv-4462, 2015 WL 1399367, at *6 (N.D. Ill. Mar. 23, 2015)(same).

Finally, the incentive award and its proposed amount were discussed with the Defendant with the assistance of Magistrate Judge Kim and no one ever batted an eye at the request. Indeed, the amount requested is included as a term in the Settlement Agreement and all class members have been notified of it. Yet not a single class member has objected to it. That is powerful evidence of its reasonableness.

28

## CONCLUSION

Given the reasons stated above, the Court should enter the proposed Order (Ex. 8) granting this motion in its entirety and (1) approve the proposed Settlement Agreement as fair, reasonable, and adequate; (2) approve the attorney's fees request of 33% of the Settlement Fund plus expense reimbursement; and (3) award Andrea Dunn an incentive award of $25,000 for her contribution in bringing and prosecuting this matter.

Respectfully submitted,

Dated: April 28, 2020       By:    */s/ Matthew T. Heffner*
                                   Matthew T. Heffner
                                   **Heffner Hurst**
                                   30 N. LaSalle, Suite 1210
                                   Chicago, Illinois 60602
                                   312.346.3466
                                   mheffner@heffnerhurst.com

                                   */s/Jordan Marsh*
                                   Jordan Marsh
                                   **The Law Office of Jordan Marsh**
                                   55 E. Monroe, Suite 3800
                                   Chicago, Illinois 60603
                                   312.401.5510
                                   jmarsh@jmarshlaw.com